## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BARBARA HOYOS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 3:19-cv-01249 (VLB)** |
| | : | |
| **CITY OF STAMFORD, et al.,** | : | |
| **Defendants.** | : | **September 20, 2021** |

## MEMORANDUM OF DECISION GRANTING
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, [ECF NO. 46]</u>

This action is brought by Plaintiff Barbara Hoyos against the City of Stamford and several Stamford police officials; namely, Sergeants Kevin Keenan and Jennifer Lynch, and Officers Kiana Oliva, Andrew Czubatyj, and Michael Califano, for alleged improprieties associated with Plaintiff's arrest on the morning of July 14, 2017.  Plaintiff asserts causes of action for deprivation of her federal rights under 42 U.S.C. § 1983 for false arrest against all individual defendants (Count One); deprivation of her federal rights under 42 U.S.C. § 1983 for malicious prosecution against Defendants Oliva, Keenan, and Lynch (Count Two); malicious prosecution under the laws of the State of Connecticut against Defendants Oliva, Keenan, and Lynch (Count Three); intentional infliction of emotional distress against Defendants Oliva and Keenan (Count Four); negligent infliction of emotional distress against Defendants Oliva and Keenan (Count Five); and *Monell* liability against the Defendant City of Stamford for failure to train, supervise and/or discipline the Defendant officers involved (Count Six). [ECF No. 45 (Second Amended Complaint ("SAC"))].  Plaintiff also asserts that the

City is liable for the negligent acts of its employees under Connecticut General Statutes § 52-557n and that the City of Stamford is required to indemnify its employees who caused physical injury to the plaintiff and/or violated her civil rights under Connecticut General Statutes § 7-465 (Count Seven).  [ECF No. 45 (SAC)].

Before the Court is Defendants' Motion for Summary Judgment on all counts of the Second Amended Complaint.  [ECF No. 46].  For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.

## I. MATERIAL FACTS

The Court draws the following facts from the Parties' Local Rule 56(a) Statements of Material Facts as supported by evidence in the record.

Plaintiff called the City of Stamford 911 Emergency Communication Center ("ECC") on July 14, 2017 at 1:16 in the morning.  [ECF No. 50 (Defendants' Revised Local Rule 56(a)1 Statement of Material Facts) ("Defs.' Stmt.") ¶ 1 (citing Defendants' Exhibit B (Affidavit of ECC Director Joseph Gaudett) Exhibit 3 (Incident Detail Report) ECF No. 46-3 at 2-3, 11-20]; [ECF No. 54 (Plaintiff's Local Rule 56(a)2 Response to Defendants' Revised Statement of Material Facts) ("Pl.'s Stmt.") ¶ 1].  On the night in question, Plaintiff ran from the residence at 142 Old North Stamford Road, Stamford, Connecticut, where she lived with her ex-boyfriend, Eugene Fattore ("the residence") down the street to Coalhouse Pizza on High Ridge Road in Stamford.  Defs.' Stmt. ¶ 1; Pl.'s Stmt. ¶ 1 (citing

Deposition Transcript of Barbara Hoyos dated September 17, 2020 at 102:11-16) (Defs.' Ex. C), [ECF No. 46-4].

During the call, Plaintiff "reported to the 911 operator that she and her ex-boyfriend had gotten into an argument after '. . . he started going, I guess, through the boxes and he found like 3 little Christmas knives and said that I'm stealing all of his stuff.'"   Defs.' Stmt. ¶ 2 (quoting 911 Call Audio, Defs.' Ex. B (Gaudett Aff. Ex. 1) at 00:52-00:58); Pl.'s Stmt. ¶ 2.  "When asked further about the 'small Christmas knives', [Plaintiff] said: 'Yes, little tiny butter knives.  He went through a box that I had packed and honestly, I think they are his. . .'  She repeated later in the call: 'And honestly, those knives, those little things, I think they are his . . .'  And one last time, 'We're talking $2.99 butter knives and they are his, they're his, I admit it.'"   Defs.' Stmt. ¶ 3 (quoting 911 Call Audio, Defs.' Ex. B (Gaudett Aff. Ex. 1) at 1:34-1:40; 6:10-6:15; 11:17-11:21); Pl.'s Stmt. ¶ 3.

"Officer Czubatyj ("Czubatyj") and Officer Oliva ("Oliva") were dispatched to 142 Old North Stamford Road on the report of a verbal domestic between" Plaintiff and Fattore.  Defs.' Stmt. ¶ 4 (citing Defs.' Ex. D, [ECF No. 46-5 (Czubatyj Affidavit)] ¶ 5); Pl.'s Stmt. ¶ 4.  Officers Czubatyj and Oliva were each alone in their police vehicles when dispatched to the residence by the ECC.  Defs.' Stmt. ¶¶ 5-6 (citing Defs.' Ex. D ¶ 4 and Defs.' Ex. E, [ECF No. 46-6 (Deposition Transcript of Kiana Oliva dated November 10, 2020 at 37:15-18)]; Pl.'s Stmt. ¶¶ 5-6.

"Officers Califano ('Califano') and Donahue ('Donahue') were partners and rode together in patrol vehicle #53 during the midnight shift on July 14, 2017. They were dispatched to the Coalhouse Pizza location." Defs.' Stmt. ¶ 7 (citing Defs.' Ex. F, [ECF No. 46-7 (Califano Affidavit)] ¶¶ 5-6); Pl.'s Stmt. ¶ 7.

"Sergeant Keenan, a patrol sergeant on duty during the midnight shift on July 14, 2017, also responded to the residence located at 142 Old North Stamford Road." Defs.' Stmt. ¶8 (citing Defs.' Ex. G, [ECF No. 46-8 (Keenan Affidavit)] ¶¶ 7-9); Pl.'s Stmt. ¶8.

"As they were dispatched, all officers were informed that [Plaintiff] reported 'that she's having difficulty with her boyfriend Gene Fattore'; that he was in the house at the 142 Old Stamford Road location and that she was at Coalhouse Pizza calling for assistance. They were also told that 'there are guns in the house but they should be secured' and that it 'was verbal only, at this time.' In response to an officer's inquiry about any history on Fattore, dispatch stated that there was 'a previous 90 Frank just yesterday at that location, same party.'" Defs.' Stmt. ¶ 9 (quoting ECC Police Dispatch audio, Defs.' Ex. B (Gaudett Aff. Ex. 2) at 00:21-00:41; 00:43-00:51; 02:03-02:10); Pl.'s Stmt. ¶ 9.

"Before [Plaintiff] arrived on the scene, Oliva began interviewing Fattore and was told the following: he has a relationship with [Plaintiff]; she was given an order from a marshal that she would have to be out of the house within two months; she is packing things up and taking things from the house; he feels like

4

things are disappearing; she calls his family, calls his job; calls anyone he knows; he feels like he is being taken advantage of; she is using the police to threaten him because nothing else is working."  Defs.' Stmt. ¶ 13 (citing Oliva Depo. Tr. at 35:13-15; 33:15-25; 34:1-5; 35); Pl.'s Stmt. ¶ 13.  "Fattore said that [Plaintiff] was financially dependent on him; that she was asking for money and taking his items and that when she did not get what she wanted, she would call his ex-wife, his current employer, and his daughter.  He told Oliva that he was afraid he was going to lose his job and that it would affect his family life.  He said it was a nightmare."  Defs.' Stmt. ¶ 14 (citing Oliva Depo. Tr. at 52:10-12; 66:9-13; 68:4-13; 58:2-3); Pl.'s Stmt. ¶14.

"When asked whether he burst into [Plaintiff's] bedroom, Fattore said that he did not. He said that he opened the door to speak with [Plaintiff].  He said he wanted to talk to her about the knives; why she had taken the knives; why she was taking everything.  He said he was upset."  Defs.' Stmt. ¶ 19 (citing Oliva Depo. Tr. at 195:2-4, 18-24); Pl.'s Stmt. ¶19.

"During one of her interviews with Fattore, he told Oliva that [Plaintiff] was taking things and he specifically referred to decorative Santa knives being stolen from him."  Defs.' Stmt. ¶ 33 (citing Oliva Depo. Tr. at 118:15-23; 119:1-4).  "He told Oliva and Keenan that the knives were in a box, which [Plaintiff] had packed, and he was very upset about it because the knives were something that his father had left to him."  Defs.' Stmt. ¶ 33 (citing Oliva Depo. Tr. at 121:25; 122:1-12;

Keenan Aff. ¶ 16).  "Oliva saw the Santa knives, which Fattore described as decorative knives, in a packed box as did Czubatyj."  Defs.' Stmt. ¶ 34 (citing Oliva Depo. Tr. at 134:18-20; Czubatyj Aff. ¶10).  "Oliva told Keenan that she saw them packed in the box."  Defs.' Stmt. ¶ 34 (citing Keenan Aff. ¶18). "The box was opened in her presence by Fattore."  Defs.' Stmt. ¶ 34 (citing Oliva Depo. Tr. at 144:6-9).

"Fattore did not appear angry or excited to Oliva; he seemed deflated, upset, disappointed, sad, helpless."  Defs.' Stmt. ¶ 16 (citing Oliva Depo. Tr. at 55:15-25; 56:1-2).  "Keenan found him to be calm, composed and cooperative, although somewhat defeated and resigned to the situation."  Defs.' Stmt. ¶ 16 (citing Keenan Aff. ¶¶ 10, 17). Pl.'s Stmt. ¶ 16.  "Fattore did not appear to be intoxicated to any of the officers."  Defs.' Stmt. ¶18 (citing Keenan Aff. ¶¶ 10, 17; Califano Aff. ¶ 11; Czubatyj Aff. ¶ 11; Oliva Depo. Tr. at 56:3-6; 57:13-18); Pl.'s Stmt. ¶18.

"[Plaintiff] remained in the back seat of the squad car for about five minutes once she arrived back at the residence."  Defs.' Stmt. ¶22 (citing Defs.' Ex. C, [ECF No. 46-4 (Deposition Transcript of Barbara Hoyos dated September 17, 2020 at 110:22-25; 111:1; 111:17-20)].  "In their initial interview, Oliva asked [Plaintiff] why she called the police and [Plaintiff] said that Fattore had opened the door to her bedroom aggressively and that he was yelling.  She made no allegation of physical violence or destruction of property.  Oliva asked her if there

was anything other than yelling and [Plaintiff] said no."  Defs.' Stmt. ¶ 25 (citing Oliva Depo. Tr. at 94:3-6; 94:23-25; 95:1-3; 96:22-24); Pl.'s Stmt. ¶ 25.

"After she got to the residence, [Plaintiff] . . . left with a police officer to go into the house to plug in her phone."  Defs.' Stmt. ¶ 27 (citing Hoyos Depo. Tr. at 131:4-9); Pl.'s Stmt. ¶ 27.  "[Plaintiff] was very concerned about charging her cell phone, on which it turned out she was recording some of her conversations with the officers."  Defs.' Stmt. ¶ 27 (citing Keenan Aff. ¶ 17); Pl.'s Stmt. ¶ 27.

On her way into the residence Keenan spoke with Plaintiff, "explain[ing] to her that she and Fattore needed to resolve their issues so that everyone remained safe."  Defs.' Stmt. ¶ 28 (citing Keenan Aff. ¶ 13); Pl.'s Stmt. ¶ 28.  Specifically, Keenan told Plaintiff that she needed to reach "some kind of resolution, you know… you're tying up six police officers and we've got a busy night, so you guys gotta start putting on your big boy pants and figuring something out."  Pl.'s Stmt. ¶ 28. (citing Pl.'s Ex. A to Pl.'s Ex. 22 [ECF No. 55-22 at 6], Plaintiff's recording of Defendants' conversations at 2:38 – 2:47; Pl.'s Ex. 3, [ECF No. 55-3 (Deposition Transcript of Barbara Hoyos dated September 17, 2020 at 118:4-6)]; Pl.'s Ex. 4, [ECF No. 55-4 (Deposition transcript of Kevin Keenan dated November 9, 2020 at 56:6-12)]).

"Oliva felt that [Plaintiff] was not helpful.  She was . . . packing her bags and not being compliant with any of [Oliva's] questions or any of the things that [Oliva] asked her."  Defs.' Stmt. ¶ 30 (citing Oliva Depo. Tr. at 95:20-24; 96:12-18).

7

"During the course of interviewing both individuals, officers asked both [Plaintiff] and Fattore if they could stay somewhere else for the night to prevent further conflict.   [Plaintiff refused, stating] that her leaving was out of the question; that since Fattore was the one 'carrying on', if anyone needed to leave the house, it should be him."   Defs.' Stmt. ¶ 31 (citing Oliva Depo. Tr. at 97:16-22; 98:1-2; Defs.' Ex. C. Hoyos Depo. Tr. at 133:17-25).   "When the officers asked Fattore if he could go somewhere else for the evening, he said he was afraid to leave the house; that [Plaintiff] would destroy the house; and he did not want to leave."   Defs.' Stmt. ¶ 32 (citing Oliva Depo. Tr. at 98:11-13).

"Before she was arrested, Oliva told [Plaintiff] that Fattore said that [Plaintiff] packed away his Christmas knives and had taken other things."   Defs.' Stmt. ¶ 35 (citing Hoyos Depo. Tr. at 146:23-25).   "Oliva recalled that at the time of the incident, [Plaintiff] said, 'I may have taken his Santa Knives but nothing else.'"   Defs.' Stmt. ¶ 37 (citing Oliva Depo. Tr. at 149:14-18).   "Keenan recalled a similar statement by [Plaintiff]; that she said something like, 'well, that's all I took.'"   Defs.' Stmt. ¶ 37 (citing Keenan Aff. ¶ 20).   "When asked whether she had packed any of Fattore's items, [Plaintiff] state[d at her deposition] that she told Oliva she didn't know whether she had packed away some of his things; that she would have to see them."   Defs.' Stmt. ¶ 36 (citing Hoyos Depo. Tr. at 147:10-13, 20-22). "[Plaintiff] did not deny that the knives belonged to Fattore."   Defs.' Stmt. ¶ 38 (citing Keenan Aff. ¶ 20).

8

"Oliva placed [Plaintiff] under arrest, and [Plaintiff] was told that she was being arrested for larceny."  Defs.' Stmt. ¶ 40 (citing Hoyos Depo. Tr. at 144:16-21; 201:22-24; 145:18-20).

"Sergeant Keenan went back on the road after [Plaintiff's] arrest.  He did not return to the police station while [Plaintiff] was being processed and as a result, he was not involved in her booking or her release from custody."  Defs.' Stmt. ¶ 45 (citing Keenan Aff. ¶ 22).

"The Desk Sergeant . . . Stephen Murphy . . . made the decision to release [Plaintiff] on a promise to appear and that she be given conditions of release." Defs.' Stmt. ¶¶ 46, 47 (citing Defs.' Ex. H, [ECF No. 46-9 (Sargent Jennifer Lynch Affidavit)] ¶¶ 8, 9, 19).   "Sergeant Lynch ('Lynch'), a patrol sergeant on duty that morning, was asked to notarize [Plaintiff's] signature on the Conditions of Release form."  Defs.' Stmt. ¶ 53 (citing Lynch Aff. ¶ 19).  "Lynch explained the terms of the Conditions of Release to [Plaintiff] before notarizing her signature." Defs.' Stmt. ¶ 53 (citing Hoyos Depo. Tr. at 161:17-24; 162:9-14).

"[Plaintiff] was never placed in a jail cell."  Defs.' Stmt. ¶ 50 (citing Hoyos Depo. Tr. at 157:19-20).   "Oliva filled out the top portion of the Conditions of Release form."  Defs.' Stmt. ¶ 51 (citing Oliva Depo. Tr. at 157:21-26).  "Oliva was concerned for the safety of both Fattore and [Plaintiff].  It was her belief that there was present danger and the likelihood that physical violence would occur if

9

[Plaintiff] was allowed to return after her arrest and before she went to court." Defs.' Stmt. ¶ 52 (citing Oliva Depo. Tr. at 188-189; 1910.

"The Conditions of Release by its terms remained in effect only until [Plaintiff] appeared in court on July 14, 2017 . . . for her arraignment a few hours after she was released from the SPD."  Defs.' Stmt. ¶¶ 57-58 (citing Defs,' Ex. I [ECF No. 46-10 Conditions of Release]; Hoyos Depo. Tr. at 163:1, 23-25; 164:10-13; 182:21-25; 183:1-2).   "At that time, Judge Blawie imposed an Order of Protection."  Defs.' Stmt. ¶ 59 (citing Hoyos Depo. Tr. at 167:10-14; Defs.' Ex. J. [ECF No. 46-11 Order of Protection])*.*

## II.      Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not

required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

### III.    DISCUSSION

#### A.    Count One: False Arrest Against All Individual Defendants

Plaintiff was arrested on the morning of July 14, 2017 for larceny in the sixth degree, in violation of Section 53a-125b of the Connecticut General Statutes, which provides:

> (a) A person is guilty of larceny in the sixth degree when he commits larceny as defined in section 53a-119 and the value of the property or service is five hundred dollars or less.

11

(b) Larceny in the sixth degree is a class C misdemeanor.

Conn. Gen. Stat. § 53a-125b.

Connecticut's General Statutes define larceny as follows:

A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner.

Conn. Gen. Stat. § 53a-119.  "Property is defined in the larceny statutes as merely '*any* . . . personal property . . . or article of value of *any kind*. . . .'"  *State v. Fauntleroy*, 101 Conn. App. 144, 151 (2007) (quoting Conn. Gen. Stat. § 53a-118(a)(1) (emphasis added)).

"To prevail on a Section 1983 false arrest claim, a plaintiff must establish that (1) the defendant intentionally arrested him or had him arrested, (2) the plaintiff was aware of the arrest, (3) there was no consent to the arrest, and (4) the arrest was not supported by probable cause."  *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2003) (citing *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002)).  In addition, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing, *inter alia*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978)); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not

suffice and a showing of some personal responsibility of the defendant is required.").

Defendants argue that Plaintiff's claim to false arrest falters on the fourth element, that Plaintiff's arrest was not supported by probable cause, because the facts show that Defendants had probable cause to arrest Plaintiff for larceny in the 6th degree.  [ECF No. 47 at 7 ("The existence of probable cause to arrest . . . 'is a complete defense to an action for false arrest.'" (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)].

Defendants note that the information available to the arresting officer, Kiana Oliva, and her supervisor, Sergeant Keenan, included the following:

- Fattore said the decorative knives were his and explained why they had sentimental value;
- Fattore was willing to sign a statement to that effect, under oath, and he did;
- From Oliva's observations, Fattore appeared to be telling the truth;
- The knives were packed with Hoyos' belongings in a box she had indicated she was taking when she moved; [and]
- When asked whether she had taken Fattore's knives, Hoyos did not deny that the knives belonged to Fattore.

[ECF No. 47 at 7-8.  In fact, in her 911 call Plaintiff admitted to the police dispatcher that she had appropriated knives belonging to Fattore.  Defs.' Stmt. ¶ 2 (quoting 911 Call Audio, Defs.' Ex. B (Gaudett Aff. Ex. 1) at 00:52-00:58); Pl.'s Stmt. ¶ 2.  "When asked further about the 'small Christmas knives', [Plaintiff] said: 'Yes, little tiny butter knives.  He went through a box that I had packed and

13

honestly, I think they are his. . .'  She repeated later in the call: 'And honestly, those knives, those little things, I think they are his . . .'  And one last time, 'We're talking $2.99 butter knives and they are his, they're his, I admit it.'"  Defs.' Stmt. ¶ 3 (quoting 911 Call Audio, Defs.' Ex. B (Gaudett Aff. Ex. 1) at 1:34-1:40; 6:10-6:15; 11:17-11:21); Pl.'s Stmt. ¶ 3.

Thus, according to Defendants, "[t]he information that was in Oliva's possession at the time of the arrest would warrant a prudent person in believing that Hoyos wrongfully took, obtained or withheld the decorative knives from Fattore, the owner of the knives, with the intent to deprive Fattore of his knives and/or to appropriate the same to herself."  *Id.* at 8.

Defendants also argue that "it is clear that Oliva was the officer who conducted the investigation, was in possession of all the facts leading up to the arrest, and made the arrest.  There is no evidence that Califano, Czubatyj or Lynch were involved in the decision to arrest. . . . Moreover, since the undisputed evidence shows that Califano, Czubatyj and Lynch were not involved in the decision to arrest and did not have the full facts that Oliva[] possessed at the time of the arrest, judgment should enter in their favor on the false arrest claim, even if there was no probable cause to arrest."  *Id.* at 9.

Finally, Defendants argue that as to Counts One and Two, false arrest and malicious prosecution in violation of Section 1983, "[p]olice officers are entitled to qualified immunity from liability under § 1983 unless (1) they violated a federal

14

statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants continue:

> 'A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.' *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).' *Al-Kidd*, *supra* at 741. In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.' *Id.* (Internal citations omitted.) This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.' *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[ECF No. 47 at 12]. As "reasonable officers could, at the least, disagree on whether there was probable cause to arrest Hoyos for larceny in the sixth degree, . . . Oliva is entitled to qualified immunity." *Id.* at 13-14.

Plaintiff attacks Defendants' arguments on three grounds. First, Plaintiff argues that the actual crime Plaintiff was arrested for was a "family violence larceny," [ECF No. 55 at 9-10], which is clear from Plaintiff's Conditions of Release and Promise to Appear. This means, according to Plaintiff, that the arrest, to be supported by probable cause, must have been for all the elements of larceny *and* "an act of family violence to a family or household member." *Id.* at 4 (quoting Conn. Gen. Stat. § 46b-38a). Because none of the Defendants believed Plaintiff had committed any act of violence, they lacked probable cause to arrest.

15

Second, Plaintiff argues that Defendants lacked probable cause to arrest for larceny because Plaintiff had no intent to permanently deprive Fattore of the Santa knives, and Defendants had no evidence suggesting otherwise. "Defendants cannot demonstrate Plaintiff's intent to steal since neither asportation, nor any withholding occurred by Plaintiff, sufficient to establish probable cause for her arrest. *Id.* at 10 (citing *Gurevich v. City of N.Y.*, No. 06 Civ. 1646 (GEL), 2008 U.S. Dist. LEXIS 1800, at *11 (S.D.N.Y. Jan. 10, 2008) (purportedly holding that "ex-girlfriend's continued refusal to return property established probable cause for her arrest, not presence of ex-boyfriend['s] property in her apartment."). In addition, "[d]espite acknowledging that the Santa Knives may have been inadvertently placed among or around her items, Plaintiff was never given the opportunity to even see what she was accused of stealing, nor explain any possible mistake. Whatever the case may be, if Fattore saw any of his personal items in her moving boxes—at any point in time, he had immediate access and uncontroverted ability to reach in and grab his belongings." [ECF No. 55 at 10]. "Had Plaintiff's boxes been taped shut, hidden away in a locked space for which only Plaintiff had the key, perhaps a more reasonable belief of her intent to steal exists. However, that was not the case." *Id.* at 11. In addition, Fattore's sworn statements were signed after Plaintiff's arrest, making them irrelevant for probable cause purposes, and Fattore had an "axe to grind," as there were previous police calls initiated by Plaintiff, and

16

"Fattore's behavior ultimately resulted in the police responding to his Residence twice, in the span of less than 6 hours, which further motivated him to lie and make false accusations against Plaintiff, to keep himself out of trouble." [ECF No. 55 at 11-15].

Third, Plaintiff argues that Defendants lacked "arguable probable cause," because Officer Oliva "admit[ted] that even if Plaintiff flatly denied the accusation or indicated that Fattore's property ended up in her moving boxes accidently, that ultimately Plaintiff would have still been arrested." *Id.* at 17. "In light of Oliva's statement, professing her unwavering commitment, to arrest Plaintiff — despite a lack of clear intent to steal—Plaintiff is hard pressed to imagine how any officer can so brazenly disregard probable cause standards to unreasonably effectuate Plaintiff's arrest for a larceny." *Id.* The Court finds Plaintiff's arguments unavailing.

"[P]robable cause exists if a law enforcement officer 'received[] information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" *Corsini v. Brodsky*, 731 F. App'x 15, 18 (2d Cir. 2018) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006))).

"In a court's analysis of probable cause for an arrest, it is clear that 'an arresting officer's state of mind . . . is irrelevant to the existence of probable cause'; indeed, the officer's 'subjective reason for making the arrest need not be

the criminal offense as to which the known facts [objectively] provide probable cause.'"  *Berg v. Kelly*, 897 F.3d 99, 110-11 (2d Cir. 2018) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  "Stated differently, 'a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest.'"  *Id.* at 111 (quoting *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006)).  "In both *Devenpeck* and *Jaegly* it was held that officers who had objective probable cause to arrest individuals for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for arrest— were not subject to damages for false arrest under § 1983."  *Id.* (emphasis in original).  "Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).  "[P]robable cause does not demand any showing that a good-faith belief be 'correct or more likely true that false.'"  *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).  In addition, there is a "well-established principle that a showing of probable cause cannot be negated simply by demonstrating that an inference of innocence might also have been drawn from the facts alleged . . ."  *Id.* (Internal citations omitted).  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to

explore and eliminate every theoretically plausible claim of innocence before making an arrest."   *Hunter v. Bridgeport*, No. CV-97-0344157-S, 2004 Conn. Super. LEXIS 1501, at *12-13 (Conn. Super. Ct. June 4, 2004) (citing *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

> As construed by Connecticut courts,
>
> '[p]robable cause' is not a high standard.  Our Supreme Court has repeatedly held that '[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence . . . Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred . . . The probable cause determination is, simply, an analysis of probabilities . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause.'

*Demeusy v. Town of Canton*, No. HHD-CV-136040280-S, 2016 Conn. Super. LEXIS 19, at *13-14 (Conn. Super. Ct. Jan. 5, 2016) (quoting *State v. Clark*, 255 Conn. 268, 292-93 (2001)).

Here, Oliva interviewed Fattore when she arrived at the residence.  He told her that he had to get a marshal to serve a notice on Plaintiff to get out of his house; that although Plaintiff was packing her things, she was doing so very slowly; that he believed Plaintiff was stealing things from his house; that Plaintiff

was asking him for money; that when she didn't get what she wanted from him, she called his daughter, his job and anyone he knew.  He was afraid he would lose his job and that it would affect his family.  He told Oliva that he felt Plaintiff was calling the police to threaten him because nothing else was working.  Fattore described it as "a nightmare."   Although he was calm, composed and cooperative while being interviewed, Fattore seemed defeated and resigned to the situation.  Oliva similarly interviewed Plaintiff to figure out why she called police, but "Ms. Hoyos was being completely uncooperative. Anything I asked her to do, she wasn't listening. . . . I was trying to talk to her.  I was trying to speak to her.  But she was being completely noncompliant . . . So I was just trying to see if there was anything I could do and try to get from her an explanation of why we were there and why she felt all these things.  And she wasn't giving me any of that information.  She was just packing her bags and not being compliant with any of my questions or any of the things I asked her."  [ECF No. 46-6 (Oliva Depo. Tr. at 94:20-96:18)].

In addition, Officer Oliva saw the Santa knives packed in Plaintiff's boxes. Oliva Depo. Tr. at 134:4-144:17 ("I visually saw the Santa knives, which [Fattore] described as decorative knives. . . . Q.  Okay.  So are you saying now that at some point before you spoke to Barbara Hoyos, Mr. Fattore actually showed you the knives in the box?  A.  We saw the knives in the box, yes. . . . In the box that was wrapped and labelled by [Plaintiff], there were Santa knives.").

"A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."  Conn. Gen. Stat. § 53a-119. Here, Officer Oliva had probable cause to arrest Plaintiff for larceny.  Plaintiff was operating under a court order requiring her to vacate Fattore's residence; in fact, she had someone coming to assist her in moving out that very morning.  Hoyos Depo. Tr. at 133:23-24.  The Santa knives were undisputedly in boxes that Plaintiff packed to take with her when she left, and Oliva saw them there.  Fattore seemed quite sympathetic to Oliva, had properly obtained a court order to have Plaintiff evicted when she refused to move out on her own, and was very upset at Plaintiff's taking his Santa knives, which were of great sentimental value to him as they were given to him by his now-deceased father.  Plaintiff, on the other hand, was completely uncooperative with Oliva, refusing to answer her questions or cooperate in any way.   Under these circumstances, it was reasonable for Officer Oliva to surmise that Plaintiff had taken Fattore's Santa knives with the intent to take them with her when she moved out that morning.  Oliva thus had probable cause to arrest Plaintiff for larceny, which is a complete defense to a charge of false arrest.  And Plaintiff's argument that Defendants lacked probable cause to arrest her for family violence larceny is unavailing because, as the *Berg* court held: "In both *Devenpeck* and *Jaegly* it was held that officers who had objective probable cause to arrest individuals for *any* crime . . . were not subject

to damages for false arrest under § 1983." *Berg*, 897 F.3d at 111 (emphasis in original).[1]

Additionally, the minimal value of the Santa Knives, which Plaintiff referenced in her 911 call, is irrelevant, because "[p]roperty [a]s defined in the larceny statutes [i]s merely '*any* . . . personal property . . . or article of value of *any kind*. . . .'" *Fauntleroy*, 101 Conn. App. at 151 (quoting Conn. Gen. Stat. § 53a-118(a)(1) (emphasis added)).   Thus, the magnitude of monetary value of the knives is irrelevant.

In addition, given that Oliva could reasonably infer that Plaintiff intended to take Fattore's Christmas knives with her when she left the residence that morning, even if some officers would see the matter otherwise, Oliva enjoys qualified immunity for Plaintiff's arrest, even if that arrest was improper.

As Officer Oliva had probable cause to arrest Plaintiff for larceny, the Court grants summary judgment in Defendants' favor on Plaintiff's Count One for False Arrest.

---

[1] Officer Oliva was the "arresting officer" in this case, and she was supervised by Sergeant Keenan, who approved the arrest.  The other individual Defendants were not involved in the decision to arrest Plaintiff.   Thus, even if there was no probable cause to arrest Plaintiff for *any* crime, the Court would still grant summary judgment in favor of Defendants Califano, Czubatyj and Lynch on Count One.

**B.    Counts Two and Three: Malicious Prosecution Against Defendants Oliva, Keenan, and Lynch under Federal and State Law**

"[I]n order to succeed on a § 1983 claim for malicious prosecution, plaintiff must show conduct that was tortious under state law and that injury was 'caused by the deprivation of liberty guaranteed by the Fourth Amendment.'" *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995), *cert. denied* 116 S. Ct. 1676 (1996)).   "Under Connecticut law, '[a]n action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.'" *Mejia v. Wargo*, No. 3:18-cv-00982 (AWT), 2021 U.S. Dist. LEXIS 22128, at *4-5 (D. Conn. Feb. 5, 2021) (quoting *Frey v. Maloney*, 476 F. Supp. 2d 141, 147 (D. Conn. 2007)); *see also Bhatia v. Debek*, 287 Conn. 397, 404 (2008) (same).   "In the context of a [federal] malicious prosecution claim, the seizure must be 'postarraignment.'" *Dufresne v. DiCrisantis*, No. 3:14-cv-01965 (JCH), 2016 U.S. Dist. LEXIS 193096, at *8 (D. Conn. Apr. 11, 2016) (quoting *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013)).   "Where a defendant acted without probable cause, the final element, malice, may be inferred." *Id.* at *9 (citing *Falls Church Grp., Ltd. v. Tyler, Cooper and Alcorn, LLP*, 281 Conn. 84, 94 (2007)).

23

Defendants argue that given that "[p]robable cause is a complete defense to a constitutional claim for false arrest . . . [a]nd continuing probable cause is a complete defense to a constitutional claim for malicious prosecution," [ECF No. 47 at 10 (quoting *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014)], "there was probable cause for the arrest or, at the least, arguable probable cause for the arrest and there is no evidence that Oliva learned of anything after the arrest, which changed the facts as she knew them at the time of the arrest." *Id.* Defendants also argue that there are no facts in evidence supporting that Defendants acted with malice. *Id.* at 10-11. Finally, Defendants argue there is no support for Count Two, the constitutional malicious prosecution claim, because there are no facts supporting "any post-arraignment deprivation of liberty," given that "[Plaintiff] initially appeared before Judge Blawie in court a few hours after she was released from the SPD on July 14, 2017," and no other deprivations of liberty occurred, meaning that there was no constitutional violation. *Id.* at 11-12 (citing cases).

Defendants also argue that "[s]ince Oliva had arguable probable cause to arrest Hoyos for larceny in the sixth degree, she is also entitled to qualified immunity on Hoyos' malicious prosecution claims on the basis of that same arguable probable cause." *Id.* at 14. In addition, Defendants argue, "in Connecticut, the law is not settled with regard to whether conditions of release can be imposed when an officer believes that there is an imminent threat of

24

violence, but an individual has not been arrested for a Family Violence crime.  As such, Oliva is entitled to qualified immunity on any claim, which may be asserted regarding the imposition of the conditions of release."  *Id.* at 15.

Plaintiff responds first that malice may be inferred as "no Individual Defendant established sufficient probable cause to arrest or charge Plaintiff with *Larceny in the Sixth Degree* as a Family Violence Crime, or even for standalone larceny."  [ECF No. 55 at 18].  Malice is also shown in that Defendants arrested and charged Plaintiff for an improper purpose, removal from the residence to quell a domestic disturbance, Plaintiff argues, rather than for Plaintiff's commission of a crime.  *Id.* at 19-20 ("As evidenced by the record, the Individual Defendants' actions were not motivated by a desire to bring a perpetrator to justice for what they viewed as an actual crime, rather Plaintiff's arrest was a convenient way to separate cohabiting parties who were not getting along, and who—in their opinion—were 'tying up' officers and departmental resources, by having the police responding to their civil squabbles.").

Second, Plaintiff argues that she did suffer a post-arraignment deprivation of liberty in that she had to make court appearances on August 24 and September 6, 2017 prior to her case being dismissed.  *Id.* at 21.

Third, Plaintiff argues that "[t]he Individual Defendants' actions find no cover in qualified immunity" because "Plaintiff's Fourth Amendment right to be free from unreasonable seizures and arrests, absent probable cause, was 'clearly

established' at the time of her unlawful arrest." *Id.* at 23 (citing *Weinstock*, 296 F. Supp. 2d at 246). In addition, "[t]his case does not present facts wherein reasonable officers could disagree," Plaintiff argues, because "the Individual Defendants did not misjudge the situation, nor were they confused by the circumstances presented, nor forced to make a snap decision— they were growing impatient with the Plaintiff" and "against departmental policy— threatened to arrest the parties, and finding a pretextual opportunity to do so for Plaintiff, made good on that threat." *Id.* at 24.  This and "[o]ther circumstances known to the officers prior to their decision to arrest . . . militate against granting them qualified immunity." *Id.* (citing *Schwartz v. Marcantonatos*, 567 F. App'x 20, 23 (2d Cir. 2014)).  As to Defendants' argument that the law is not settled with regard to whether conditions of release can be imposed when an officer believes that there is an imminent threat of violence, but an individual has not been arrested for a Family Violence crime, Plaintiff argues that "[a] case directly on point is not required so long as existing precedent must have placed the statutory or constitutional question beyond debate . . . [t]he critical question in qualified immunity analysis is not whether identical or materially similar facts have previously been held unlawful, but whether unlawfulness was apparent in light of pre-existing law." [ECF NO. 55 at 26-27 (quoting *Wiggan v. N.Y. City Dep't of Corr.*, No. 12 Civ. 1405 (GDP) (HBP), 2014 U.S. Dist. LEXIS 117635, at *16-17 (S.D.N.Y. Aug. 21, 2014) (internal citations and quotation marks omitted)].

Defendants' actions were wrong, Plaintiff argues, because "[i]t is without question that the predicate for the imposition of conditions of release is the commission of family violence crime, as dictated by the state statute." *Id.* at 27 (citing *State v. Fernando A.*, 294 Conn. 1, 14-15 (2009) (quoting Connecticut General Statutes § 54-63c(b) as "authorizing police officers in '<u>family violence</u> <u>crime' cases</u>, . . ., to . . . impose nonfinancial conditions of release.") (emphasis added in Plaintiff's brief). "If Plaintiff was arrested only for *Larceny in the Sixth Degree*, as the Defendants maintain—by their own logic Connecticut law dictates that conditions of release cannot be imposed." *Id.* at 27. This means that "the Individual Defendants violated Plaintiff's clearly-established right to be free from arrest, without probable cause, when they arrested her for a Family Violence Larceny, not to mention the fact that they also violated her rights by placing restraints upon her freedom of movement and travel when they imposed the *Conditions of Release.*" *Id.* at 28 (citing *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (right to free movement recognized by Second Circuit)). This means that Defendants should not, Plaintiff argues, enjoy the protections of qualified immunity for either Counts One or Two.

Given that "[p]robable cause is a complete defense to a constitutional claim for false arrest . . . [a]nd continuing probable cause is a complete defense to constitutional claim for malicious prosecution," *Betts*, 751 F.3d at 82, that lack of probable cause is also an element of malicious prosecution under Connecticut

state law, *Mejia*, 2021 U.S. Dist. LEXIS 22128, at *4-5 (quoting *Frey*, 476 F. Supp. 2d at 147), and given that the Court has determined that Officer Oliva had probable cause to arrest Plaintiff for larceny, the Court grants Defendants' Motion for Summary Judgment on Counts Two and Three.

Additionally, the Court finds that Defendants did not act with malice when arresting Plaintiff.  First, malice may be inferred when there is lack of probable cause, but such is not the case here.   Second, Officer Oliva, faced with a situation where Plaintiff appeared to be in the throes of absconding with Fattore's prized, although minimally valuable, Christmas knives, made the reasonable, non-malicious decision to arrest Plaintiff for larceny.  The Court will not infer malice in a police action that clearly comports with the state criminal statute at issue.  For these reasons, the Court grants summary judgment in Defendants' favor on Plaintiff's Counts Two and Three for malicious prosecution.

C.    Count Four: Intentional Infliction of Emotional Distress Against Defendants Oliva and Keenan

In the State of Connecticut, to succeed on a claim for intentional infliction of emotional distress a plaintiff must show

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

28

*Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 343 (D. Conn. 2013) (citing

*Petyan v. Ellis*, 200 Conn. 243, 253 (2006)).

The Connecticut Supreme Court provided the following guidance to

determine whether conduct is "extreme and outrageous":

> Liability for intentional infliction of emotional distress requires
> conduct that exceeds all bounds usually tolerated by decent society.
> Liability has been found only where the conduct has been so
> outrageous in character, and so extreme in degree, as to go beyond
> all possible bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community.  Generally, the case is
> one in which the recitation of the facts to an average member of the
> community would arouse his resentment against the actor, and lead
> him to exclaim, 'Outrageous!'  Conduct on the part of the defendant
> that is merely insulting or displays bad manners or results in hurt
> feelings is insufficient to form the basis for an action based upon
> intentional infliction of emotional distress.

*Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000) (internal quotations and

citations omitted).  In considering whether a plaintiff's claim for IIED sufficiently

alleges extreme and outrageous conduct, the court evaluates "the [party's]

conduct, not the motive behind the conduct."  *Miner v. Cheshire*, 126 F. Supp. 2d

184, 195 (D. Conn. 2000) (citation omitted).

Defendants argue that Plaintiff's claim that Defendant Keenan told her she

needed to start "putting on her big boy pants," Plaintiff's claim that Oliva told her

that "one or both of the residents would be arrested, and that the [officers] could

not remain there all night," which Oliva denies, and Plaintiff's conclusory claims

that "she was arrested without probable cause; that illegal conditions of release

were imposed on her; that the officers' actions were 'unjustified, unreasonable

and unlawful'; and that, as a result of the officers' actions, she 'suffered severe emotional distress including great humiliation, embarrassment, anxiety, stress, emotional and mental upset, loss of sleep, and loss of time from personal pursuits'" all fail to support a finding that Defendants intentionally inflicted emotional distress on Plaintiff. [ECF No. 47 at 19]. This is so, Defendants argue, because "[t]he recitation of these facts/conclusory statements to an average member of the community would not arouse that community member's resentment against the officers, and lead the community member to exclaim, Outrageous!" *Id.* (citing *Grasso v. Conn. Hospice, Inc.*, 138 Conn. App. 759, 776 (2012), *Smith v. City of New Haven*, 166 F. Supp. 2d 636, 646 (D. Conn. 2001)).

Plaintiff counters that "[t]he average member of society would exclaim 'Outrageous!' after learning that it [i] was Plaintiff who called the police, terrified, her ex-boyfriend bursting into her bedroom in the early hours of the morning, his growing anger fueled by alcohol, but Oliva and Keenan manufactured her arrest, and in twisted fashion ensured she was charged as a family violence offender, . . . [ii] Oliva threatened Plaintiff, a domestic violence victim now three-times over, with arrest in contravention of state law and departmental policy, if Plaintiff did not choose to drive to her nearest place of refuge away in New Jersey, in the middle of the night, . . . [iii] Oliva and Keenan belittled her and spoke condescendingly towards her, wherein Keenan told Plaintiff, a victim of domestic abuse, to 'put her big boy pants on' and 'figure something out,' because it was

she who was 'tying up 6 police officers, and we got a busy night'[, and iv] Oliva and Keenan imposed conditions on Plaintiff's release, preventing her from returning to her Residence, effectively rendering her homeless." [ECF No. 55 at 31].

"[F]ederal district courts in the Second Circuit have interpreted the qualification of extreme and outrageous strictly." *Smith v. City of New Haven*, 166 F. Supp. 2d at 646; *see also Reed v. Signode Corp.,* 652 F. Supp. 129, 137 (D. Conn. 1986) (holding conduct not extreme and outrageous where uniform company policy that forbade leaves of absence was applied to an employee seeking leave to undergo chemotherapy treatments for cancer); *Lopez–Salerno v. Hartford Fire Ins. Co.*, No. 3:97-cv-00273 (AHN), 1997 WL 766890, at *6 (D. Conn. Dec. 8, 1997) (granting motion to dismiss where plaintiff alleged she was terminated so that defendant could avoid giving her long-term disability benefits); *Thompson v. Serv. Merch., Inc.*, No. 3:96-cv-01602 (GLG), 1998 WL 559735, at *1 (D. Conn. Aug. 11, 1998) (granting motion for summary judgment and finding that allegations made by plaintiff of employer denigrating her race, removing her responsibilities in order to undermine her authority, and failing to provide adequate supervision and sufficient staff to do her job, did not constitute extreme and outrageous conduct).

Here, in light of Defendants' probable cause to arrest Plaintiff for larceny, Defendants' conduct does not rise to the outrageous level required for an

intentional infliction of emotional distress claim.  Sargent Keenan's comments about Plaintiff needing to "put on her big boy pants" was undoubtedly unprofessional and not in keeping with the standards to which the Court expects law enforcement to aspire, but it was not so outrageous to meet the strict requirements for this cause of action.   In addition, the Court agrees with Defendants that Plaintiff "fails to cite to any evidence, and there exists no evidence, to support her claim that 'Oliva and Keenan manufactured her arrest,'" [ECF No. 61 (Reply Brief) at 8 (quoting Plaintiff's Opposition Brief at 31)], fails to cite "evidence that Oliva belittled [Plaintiff], spoke to her in a condescending way or humiliated her," *id.* at 8 (citing Plaintiff's Oppo. at 31), and fails to cite "evidence that the impositions of the Conditions of Release, which expired hours after [Plaintiff's] release upon her appearance in court, rendered her homeless as [Plaintiff] claims." *Id.*

For these reasons, the Court grants summary judgment to Defendants on Plaintiff's Count Four intentional infliction of emotional distress claim.

### D.   Count Five: Negligent Infliction of Emotional Distress Against Defendants Oliva and Keenan

"To prevail on a claim of negligent infliction of emotional distress, Plaintiff is required to prove that (1) the defendant's conduct created an unreasonable risk of causing Plaintiff emotional distress; (2) Plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of Plaintiff's distress." *Hall*

*v. Bergman*, 296 Conn. 169, 182 n.8 (2010) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003)).  "The foreseeability requirement in a negligent infliction of emotional distress claim is more specific that the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm . . ."  *Stancuna v. Schaffer*, 122 Conn. App. 484, 490 (2010).  It "requires that the fear or distress experienced by the plaintiff[] be reasonable in light of the conduct of the defendants.  If such [distress] were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable.  Conversely, if the [distress] were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable."  *Wilson v. Jefferson*, 98 Conn. App. 147, 162 (2006) (citing *Larobina v. McDonald*, 274 Conn. 394, 410 (2005)).

Defendants argue that "there are very few facts alleged in plaintiff's Second Amended Complaint that would support the elements of a negligent infliction of emotional distress claim.  The plaintiff asserts that '[b]ecause of Defendant Lynch erroneously labeling the Plaintiff's file as a 'family violence' case, it proceeded through the criminal courts as such, and the Plaintiff was subjected to an unlawful Order of Protection for a month;' that the plaintiff was 'mischaracterized as a domestic violence offender, after having previously

experienced domestic abuse herself for a substantial period of time'; that 'Lynch knew or should have known that there was no basis to impose family violence conditions of release in the Plaintiff's case'; and that 'the defendants knew or should have known that severe emotional distress was the likely result of such conduct.'"  [ECF No. 47 at 20-21 (quoting SAC, ¶¶ 43, 44, 54, 56)].

Defendants counter, "the claim of negligent infliction of emotional distress is not even asserted against Lynch," and allegations against her will not support such a claim against the other Defendants.  *Id.* at 21.  Finally, Defendants argue, "there is no evidence to support the assertion that Lynch labeled [Plaintiff's] file as a 'family violence' case, or that any defendant knew that [Plaintff] had 'experienced domestic abuse herself.'"  *Id.*

Moreover, Defendants argue that because their acts in arresting Plaintiff were discretionary, *id.* (citing *Smart v. Corbitt*, 126 Conn. App. 788, 800 (police functions generally categorized as discretionary acts), *cert. denied*, 301 Conn. 907 (2011)), their actions are protected by discretionary act, governmental immunity.  *Id.* at 21-22 (citing, *inter alia*, *Ventura v. Town of East Haven*, 330 Conn. 613, 630-31 (2019) ("[p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer.").  And, Defendants argue, no exceptions to governmental immunity, such as the identifiable victim subject to imminent harm exception, apply.  *Id.* at 22-23 (citing *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d 98, 121 (D. Conn. 2019) ("a

violation of [Plaintiff's] constitutional rights or the emotional distress she allegedly suffered -- is not the type of dangerous condition that rises to a level so as to invoke the imminent harm to identifiable victim exception.") (internal quotation marks omitted)).

Plaintiff responds that the same facts supporting her intentional infliction of emotional distress claim support her negligent infliction of emotional distress claim. [ECF No. 55 at 32-33]. In addition, Plaintiff argues, "Connecticut law does not require extreme and outrageous conduct to establish a claim of negligent infliction of emotional distress," *id.* at 33 (quoting *Crocco v. Advance Stores Co.,* 421 F. Supp. 2d 485, 505 (D. Conn. 2006)), and because of her arrest "Plaintiff had to endure a period of transience, living on the goodwill and generosity of friends and family, she had to borrow money for legal fees, and her state of mind impacted her ability to seek employment and to gain financial independence, Plaintiff also grew depressed, among a great many other emotional and mental injuries." *Id.* (citing Pl.'s Ex. 3, Hoyos Depo. Tr. at 226:3-230:13).

Plaintiff also argues that the "imminent harm exception bars Defendants' claim of governmental immunity" because "Plaintiff is the quintessential example of an identifiable individual at risk of imminent harm," given that "any reasonable police officer who learned the circumstances of Plaintiff's arrest should have immediately recognized that it was improper to treat her arrest as a family violence crime and would have taken steps to clarify the conclusion" and "[i]t

was apparent to Defendants . . . that their negligent conduct would likely cause Plaintiff, an identifiable victim, specific imminent harm." *Id.* at 34.  Plaintiff analogizes her situation to the one in *Sestito v. Groton*, 178 Conn. 520, 522 (1979), in which police failed to protect an individual gunshot victim, despite watching the victim involved in a brawl outside of a bar and failing to act, because "in this case Plaintiff was readily identifiable to the defendants, as both a domestic violence victim and ultimately the subject of their criminal investigation and arrest.  Instead of intervening to prevent the imposition of the *Conditions of Release* or the treatment of Plaintiff's prosecution as a family violence larceny, the Individual Defendants washed their hands of Plaintiff and stood idly by, as her protracted legal process continued."  [ECF No. 55 at 35 (citing Pl.'s Ex. 3, Hoyos Depo. Tr. at 234:8-236:14)].  Plaintiff also argues that the individual defendants acted pursuant to ministerial duties, but that if not, they are still liable due to the imminent harm exception. *Id.* at 34 n.34.

Defendants reply that Plaintiff "makes a halfhearted attempt at claiming that the actions at issue are ministerial in nature," but "[the Connecticut] courts consistently have held that to demonstrate the existence of a ministerial duty on the part of the municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, rule, policy or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner without the exercise of judgment or discretion . . ."  [ECF No. 61 at 9

(quoting *Borelli v. Renaldi,* 336 Conn. 1, 12 (2020) (citing *Ventura v. East Haven*, 330 Conn. 613, 631-32 (2019)).  But, Defendants argue, Plaintiff's "failure to cite to any such statute, charter provision, ordinance, rule, policy or other directive is fatal to her claim that the actions were ministerial in nature."  *Id.*  Additionally, Defendants argue, "[t]hese assertions, even if properly supported, are unavailing as the duties at issue – the arrest of the plaintiff and the imposition of conditions of release – involved the discretion of the officers."  *Id.* at 9 n.8 (citing *Klein v. Glick*, No. 3:19-cv-01056 (SRU), 2020 WL 5097444, at *6 (D. Conn. Aug. 28, 2020) (citing *Bussolari v. City of Hartford*, No. 3:14-cv-00149 (JAM), 2016 WL 4272419, at *4 (D. Conn. Aug. 12, 2016)).  Additionally, Defendants reply that the imminent harm exception to governmental immunity is inapplicable here because Plaintiff "fails to demonstrate how the harm alleged in this action is the type of *physical* harm required for that exception to apply, as recognized by this court in *Chase v. Nodine's Smokehouse, Inc*., 360 F.Supp.3d 98, 121 (D. Conn. 2019)," and because Plaintiff's "reliance on the case of *Sestito v. Gordon*, 178 Conn. 520 (1979*), is* misplaced since that case was decided before the Connecticut courts adopted the three-prong imminent harm test and since the Connecticut Supreme Court 'has repeatedly stated that *Sestito* has been confined to its facts.'"  *Id.* at 9-10 (quoting *Borelli*, 336 Conn. at 32 (emphasis in Reply Brief)).

The Court agrees with Defendants that the allegations supporting this Count are largely aimed at Defendant Lynch, but "the claim of negligent infliction

of emotional distress is not even asserted against Lynch," and allegations against her will not support such a claim against Defendants Oliva and Keenan. [ECF No. 47 at 20-21 (quoting SAC ¶¶ 43, 44, 54, 56)].

In addition, it is clear that Defendants Oliva and Keenan, whom this Count is directed towards, are entitled to governmental immunity given that Plaintiff's arrest was a discretionary act. *See Smart*, 126 Conn. App. at 800 (police functions generally categorized as discretionary acts); *Ventura*, 330 Conn. at 630-31 ("[p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer.").

The Connecticut Supreme Court has made clear why this is so important:

Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.

*Violano v. Fernandez*, 280 Conn. 310, 318-19 (2006) (internal quotation marks omitted).

The Court also agrees with Defendants that the imminent harm exception to governmental immunity does not apply.  That exception applies "when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm."  *Ravalese v.*

*Town of East Hartford*, No. 3:16-cv-01642 (VAB), 2019 WL 2491657, at *11 (D. Conn. June 14, 2019) (citing *Doe v. Petersen*, 279 Conn. 607, 615–16 (2006)).  "The 'identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm....All three must be proven in order for the exception to apply.'"  *Id.* (quoting *Haynes v. City of Middletown*, 314 Conn. 303, 312–13 (2014)).

In *Ravalese*, "defendant [police] officers . . . responding to a 911 call, interviewing witnesses and the alleged victim in response, knocking on Plaintiff's door, and then deciding to arrest him—was not a dangerous condition so likely to cause Plaintiff harm that a clear and unequivocal duty to act immediately to prevent the harm was created."  2019 WL 2491657, at *11 (citing *Martinez v. City of New Haven*, 328 Conn. 1, 11 (2018)); *see also Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d at 121 ("non-physical harm is 'not the type of 'dangerous condition' that rises to a level so as to invoke the imminent harm to identifiable victim exception.'") (quoting *Borg v. Town of Westport*, No. 3:15-cv-01380 (AWT), 2016 WL 9001021, at *10 (D. Conn. Aug. 18, 2016); *Bento v. City of Milford*, No. 3:13-cv-01385, 2014 WL 1690390, at *6 (D. Conn. Apr. 29, 2014) ("[C]ourts in this state have also held that the imminent harm complained of must be physical in nature in order for the exception to apply."); *Pane v. City of Danbury*, No. CV-97-347235-S, 2002 WL 31466332, at *9 (Conn. Super. Ct. Oct. 18, 2002), *aff'd*, 267

Conn. 669 (2004) (finding that "[c]ases where plaintiffs allege 'imminent harm' typically involve physical harm rather than emotional distress[,]" and therefore finding governmental immunity for the plaintiff's negligent infliction of emotional distress claim).

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's Count Five for negligent infliction of emotional distress.

E.    Count Six: 42 U.S.C. § 1983 *Monell* Claim for Failure to Train, Supervise, and/or Discipline against the City of Stamford

For *Monell* liability to attach, Plaintiff "must prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).  The Court has previously described how a plaintiff can show *Monell* liability:

> Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation.  For example, it may be enough where a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials.  Additionally, [a] policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.

*Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d at 109 (citations omitted); *see also Walker v. City of N.Y.*, No. 12-CV-5902, 2014 WL 1259618, at *2 (S.D.N.Y.

Mar. 18, 2014) ("Courts have recognized four ways for plaintiffs to demonstrate a policy or custom: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers; (2) conduct ordered by a municipal official with policymaking authority; (3) actions taken pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision making channels; or (4) a failure to train municipal employees that amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.").

Importantly, however, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*, 563 U.S. at 61, and "a single instance of misconduct or mishandling of a complaint do[es] not suffice to state a *Monell* claim."   *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d at 110 (citing *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008) ("[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the State.")); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985) ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.").

41

Defendants argue that "[t]here is absolutely no evidence that there was an obvious need for more training within the Stamford Police Department ('SPD') regarding any of the following: (a) the investigation of domestic/family violence crimes; (b) the procedures employed by SPD officers in imposing conditions of release; and/or (c) the supervision of SPD officers when investigating domestic/family violence crimes or imposing conditions of release." [ECF No. 47 at 28]. Additionally, according to Defendants, "[t]his case involves a single incident in which the plaintiff claims she was falsely arrested for larceny, had her case improperly designated as 'family violence' and was illegally given conditions of release. Not once before the filing of this complaint in July of 2017 had the City been put on notice that there was any issue with the SPD's procedures regarding the investigation, supervision and training relating to domestic/family violence crimes. No one had ever complained. Nor had anyone ever filed a lawsuit alleging any problem at all with the procedures, let alone a constitutional violation arising out of the procedures." *Id.* at 28-29 (citing Defs.' Ex. M, [ECF No. 46-14 (Affidavit of Sean Cooney, Head of SPD Internal Affairs Division) ¶¶ 4,5]. As a result, Defendants argue, Plaintiff "cannot demonstrate that the need for better or different training with regard to the investigation of domestic/family violence crimes, the supervision of officers investigating domestic/family violence crimes; or the imposition of conditions of release, 'was so obvious, and the inadequacy of current practices so likely to result in a

deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'"  [ECF No. 47 at 29 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).  "As such, the necessary element of demonstrating a policy or custom cannot be shown and judgment should enter in favor of the City on Count Six." *Id.*

Plaintiff counters that "[t]he City caused the violation of Plaintiff's rights, given its infrequent, unspecific and lack of particularized and special training programs," in that "[o]fficers are only trained on domestic violence at the beginning of their careers while they are enrolled in basic training at a regional police academy, then are provided only two (2) hours of instruction, every three (3) years (unless there's a change in the law or supervisor requests more instruction from the Training Division)."  [ECF No. 55 at 38].  Moreover, Plaintiff counters, "such training is generalized" in that "[t]raining, for instance, on determining probable cause or conducting interviews is not tailored, in any way, for family violence situations."  *Id.*  Plaintiff also notes that this lack of proper training is shown by "every officer in the department ha[ving] a different interpretation on the law and the City's policies." *Id.* at 38-39 (citing testimony at the various Defendants' depositions).  Finally, Plaintiff argues that "[t]he City was on notice of deficiencies in its training, by virtue of state's statute and legislative history expressly indicating the purpose of the law is to eliminate officer discretion in the context of domestic violence enforcement," which the City of

Stamford failed to comply with.  *Id.* at 40-41.  Plaintiff sums up: "A jury could find that inadequate training exists, not only because it caused Plaintiff's injury, but because of the collective indifference and inconsistent understanding and approach to the application of the City's policies, amongst the officers in its department—there risks future violations of rights due to poorly trained employees."  *Id.* at 41.

The Court first notes that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*, 563 U.S. at 61, which is precisely what Plaintiff claims here.  Moreover, "a single instance of misconduct or mishandling of a complaint do[es] not suffice to state a *Monell* claim."  *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d at 110 (citing *Newton*, 566 F. Supp. 2d at 271 ("[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the State.")); *see also Tuttle*, 471 U.S. at 831 ("To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.").

Here, Plaintiff points primarily to the individual Defendants' conduct in this case as establishing the City's failure to train, but that is insufficient.  *Newton*, 566 F. Supp. 2d at 271.  Plaintiff also points to the City's allegedly deficient training regimen, but that alleged deficiency is belied by the fact that "[n]ot once

before the filing of this complaint in July of 2017 had the City been put on notice that there was any issue with the SPD's procedures regarding the investigation, supervision and training relating to domestic/family violence crimes.  No one had ever complained.  Nor had anyone ever filed a lawsuit alleging any problem at all with the procedures, let alone a constitutional violation arising out of the procedures."  [ECF No. 47 at 28-29 (citing Defs.' Ex. M, [ECF No. 46-14 (Affidavit of Sean Cooney, Head of SPD Internal Affairs Division) ¶¶ 4,5].  Plaintiff does not dispute this, nor, presumably, could she.  Instead, Plaintiff argues that "[a] jury could find that inadequate training exists, not only because it caused Plaintiff's injury, but because of the collective indifference and inconsistent understanding and approach to the application of the City's policies, amongst the officers in its department—there risks future violations of rights due to poorly trained employees."  [ECF No. 55 at 41].  But, as mentioned, "a single instance of misconduct or mishandling of a complaint do[es] not suffice to state a *Monell* claim," *Chase v. Nodine's Smokehouse, Inc.*, 360 F. Supp. 3d at 110 (citing *Newton*, 566 F. Supp. 2d at 271), and Plaintiff's argument that the City's deficient training program "risks future violations of rights due to poorly trained employees," [ECF No. 55 at 41], is speculative.

For the foregoing reasons the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Count Six *Monell* claim.

Finally, although there was no violence alleged on the night in question, there is no doubt there was domestic acrimony between Plaintiff and Fattore. Their domestic partnership had broken down apparently irretrievably and they were unable to separate without third party intervention.  Fattore resorted to obtaining a court order evicting Plaintiff and Plaintiff and Fattore could not amicably implement the order.  The acrimony between them was apparently severe enough to Plaintiff that she sought police protection.  Characterization of the acrimony as domestic violence was, while not a perfect characterization, not wholly without merit or justification.

F.    Count Seven: Indemnification and Municipal Liability pursuant to Connecticut General Statutes §§ 7-465 and 52-557n against the City of Stamford

Because the Court has ruled, as explained above, that the individual Defendants are not liable to the Plaintiff the City of Stamford has no duty to indemnify pursuant to Conn. Gen. Stat. § 7-465 and no liability pursuant to Conn. Gen. Stat. 52-557n.  In addition, because the Court has ruled that the imminent harm exception to governmental immunity is not applicable, the City of Stamford is not liable pursuant to Conn. Gen. Stat. 52-557n.

For these reasons, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Count Seven indemnification and liability claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment on all counts.  [ECF No. 46].  The Clerk is instructed to close this case and enter Judgment in Defendants' favor.

_____/s/_____
**Vanessa L. Bryant**
**United States District Judge**

**SO ORDERED at Hartford, Connecticut this 20th day of September 2021.**

47